1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
                                        AT SEATTLE
9

10   INTERNATIONAL PAPER                    CASE NO. C11-2139JLR
     COMPANY,
11                                          ORDER ON MOTION TO
                        Plaintiff,          DISMISS
12
                v.
13
     PAUL STUIT, et al.,
14
                        Defendants.
15
                            I.       INTRODUCTION
16
             This matter comes before the court on Defendants Paul Stuit, Robin Burr, and
17
     Midland Paper Company's ("Midland") motion to dismiss Plaintiff International Paper
18
     Company's ("IP") complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Mot.
19
     (Dkt. # 21).)  IP opposes Defendants' motion.  (Resp. (Dkt. # 24).)  Having considered
20
     the submissions of the parties, the balance of the record, and the relevant law, the court
21

22

ORDER- 1

1  GRANTS in part and DENIES in part Defendants' motion (Dkt. # 21), and GRANTS IP

2  leave to file an amended complaint within 15 days of the date of this order.[1]

3  ## II.   BACKGROUND

4  **A. Facts[2]**

5      IP is a leading producer of printing paper, among other things.  (Compl. (Dkt. # 3)

6  ¶ 12.)  Xpedx is a division of IP that includes the Strategic Paper Group ("SPG") and

7  specializes in serving the needs of magazine, catalogue, and book publishers.  (*Id.* ¶¶ 3-4,

8  13.)  Mr. Stuit was employed by xpedx from April 2005 until his resignation, without

9  notice, on December 14, 2011.  (*Id.* ¶ 8.)  At the time of his resignation, he was the Vice

10  President of SPG.  (*Id.*)  Ms. Burr was employed by xpedx from February 2004 until her

11  resignation, without notice, on December 14, 2011.  (*Id.* ¶ 9.)  Ms. Burr was a Customer

12  Service Representative for SPG.  (*Id.*)  Both Mr. Stuit and Ms. Burr were based in the

13  Issaquah, Washington area.  (*Id.* ¶¶ 8-9.)

14      While employed with xpedx, they each executed a confidentiality agreement ("the

15  Confidentiality Agreements"), agreeing not to "publish, use or otherwise directly or

16  indirectly disclose (except as directly [sic] by IP management) any *Confidential*

17  *Information* owned or possessed by IP or its employees during [their] employment with

18

19      [1] Defendants have requested oral argument (*see* Mot. at 1), however the court deems this
matter to be appropriate for resolution without a hearing and therefore denies Defendants'
20  request for oral argument.  IP did not request oral argument.

21      [2] Because the court must accept all well-pleaded allegations of material fact on a motion
to dismiss pursuant to Rule 12(b)(6), *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d
22  658, 662 (9th Cir. 1998), the court sets forth the factual allegations in the complaint below as if
they are true.

IP and for a period of 24 months thereafter." (*Id.* ¶ 25 (emphasis in complaint); *see also* Smith Decl. (Dkt. # 22) Exs. 1 (Stuit Agreement), 2 (Burr Agreement).)[3] Mr. Stuit and Ms. Burr also agreed: "When I cease my employment with IP . . . I will not use any *Confidential Information* for my own purposes or for the purposes of others either in any future jobs or to create *Inventions or Intellectual Property*." (Compl. ¶ 26 (emphasis in complaint).) The Confidentiality Agreements define "Confidential Information" as including:

> [A]ny information possessed or owned by IP which is not generally known to the public, especially if such information gives IP a competitive advantage or its disclosure would harm IP. It includes, but is not limited to, trade secrets, proprietary information and all other information, documents or materials, owned, developed or possessed by IP or any employee or consultant of IP, whether tangible or intangible, relating in any way to IP's business and operations, research and development, customers, prospective customers, business plans, business relationship, products or processes, costs or profit information or data from which that information could be derived, human resources (including internal evaluations of the performance, capability and potential of any IP employee), business methods, databases and computer programs.

(*Id.* ¶ 27.)

---

[3] The Confidentiality Agreements are not attached to IP's complaint but they are incorporated by reference. A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) ("A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."). Here, IP's complaint necessarily relies on the Confidentiality Agreements because it refers to the documents, the documents are central to IP's claims, and no party has questioned the authenticity of the copies attached to the Smith Declaration. Accordingly, the court may treat the Confidentiality Agreements as "part of the complaint, and thus may assume that [their] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Ritchie*, 342 F.3d at 908.

1      Midland is a direct competitor of xpedx.  (*Id.* ¶ 38.)  On December 14, 2011, the

2  same day that they resigned from xpedx, Mr. Stuit and Ms. Burr began working for

3  Midland.  (*Id.* ¶ 41.)  Also on December 14, 2011, Mr. Stuit sent an e-mail to his

4  customers and other xpedx business contacts notifying them of his new affiliation with

5  Midland.  (*Id.* ¶ 44.)  Mr. Stuit would not have had the contact information absent his

6  work with xpedx.  (*Id.* ¶ 45.)

7      While working for xpedx, Mr. Stuit and Ms. Burr serviced six accounts, one of

8  which was for an international membership warehouse operator and another of which was

9  for a leading national department store retailer, both based in Seattle.  (*Id.* ¶ 33.)  Within

10  two days of Mr. Stuit's and Ms. Burr's departure from xpedx and employment with

11  Midland, the membership warehouse operator and the department store retailer informed

12  xpedx that they would be terminating their relationships with xpedx, even though they

13  had not yet met the minimum purchase obligation in their contracts with xpedx.  (*Id.* ¶

14  48.)

15  **B. Procedural History**

16      On December 21, 2011, IP filed the instant lawsuit against Mr. Stuit, Ms. Burr,

17  and Midland.  (*See generally id.*)  IP asserts claims for:  (1) breach of contract against Mr.

18  Stuit and Ms. Burr; (2) misappropriation of trade secrets pursuant to RCW chapter 19.108

19  against Mr. Stuit and Ms. Burr; (3) interference with actual and prospective business

20  relationship with clients and prospects against Mr. Stuit and Ms. Burr; (4) interference

21  with actual and prospective business relations with clients and prospects against Midland;

22  (5) interference with employee confidentiality agreements against Midland; and (6) unfair

competition pursuant to the Washington Consumer Protection Act ("CPA"), RCW

chapter 19.86, against Mr. Stuit and Ms. Burr.  (Compl. ¶ 1.)  In essence, IP alleges that

Mr. Stuit and Ms. Burr have improperly used confidential information of IP to lure its

clients to Midland, and that their actions have irreparably harmed IP and will continue to

do so in the future.  (*See generally id.*)  IP seeks temporary, preliminary, and permanent

injunctive relief, damages, and reasonable attorneys' fees and costs.  (*Id.* at 18-19.)

Defendants now move to dismiss IP's complaint in its entirety.  (*See generally* Mot.)

### III.    ANALYSIS

**A. Legal Standard**

When considering a motion to dismiss under Rule 12(b)(6), the court construes the

complaint in the light most favorable to the non-moving party.  *Livid Holdings Ltd. v.*

*Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  The court must accept

all well-pleaded allegations of material fact as true and draw all reasonable inferences in

favor of the plaintiff.  *Wyler Summit P'ship v. Turner Broad. Sys.*, 135 F.3d 658, 661 (9th

Cir. 1998).  The court, however, need not accept as true a legal conclusion presented as a

factual allegation.  *Ashcroft v. Iqbal*, 556 U.S. 622, 129 S. Ct. 1937, 1949-50 (2009).

Dismissal under Rule 12(b)(6) can be based on the lack of a cognizable legal

theory or the absence of sufficient facts alleged under a cognizable legal theory.

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  "To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Telesaurus VPC, LLC v.*

ORDER- 5

1   *Power*, 623 F.3d 998, 1003 (9th Cir. 2010). "A claim has facial plausibility when the

2   plaintiff pleads factual content that allows the court to draw the reasonable inference that

3   the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "A

4   pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of

5   a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked

6   assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at

7   555).

8   **B.  Breach of Contract against Mr. Stuit and Ms. Burr**

9        IP's complaint alleges that Mr. Stuit and Ms. Burr signed the Confidentiality

10  Agreements as "an express condition of their employment and continued employment

11  with IP . . . , agreeing to be bound by the provisions relating to the use and disclosure of

12  its Confidential information." (Compl. ¶ 54.) IP further alleges that Mr. Stuit and Ms.

13  Burr violated the Confidentiality Agreements by virtue of their employment at Midland

14  and their use and disclosure of confidential information or trade secrets of IP. (*Id.* ¶ 55;

15  *see also id.* ¶¶ 51-61.) Defendants argue that this claim must be dismissed because the

16  Confidentiality Agreements are not valid and enforceable as they were not supported by

17  consideration. (Mot. 6-8.)

18       "The general rule in Washington is that contracts signed when an employee is first

19  hired, such as non-competition agreements, arbitration clauses, and confidentiality

20  provisions, are supported by consideration." *EEOC v. Fry's Elecs., Inc.*, No. C10-

21  1562RSL, 2011 WL 666328, at *1 (W.D. Wash. Feb. 14, 2011) (citing *Labriola v.*

22  *Pollard Group, Inc.*, 100 P.3d 791, 794 (Wash. 2004)). This is so because "both parties

1  make promises and incur new obligations:  the employer promises to hire the employee in

2  exchange for the employee's promise to comply with policies, procedures, and terms set

3  forth in the contract."  *Id.*  Post-employment modifications or additional agreements must

4  also be supported by independent consideration.  *Id.*; *Labriola*, 100 P.3d at 794 ("A

5  noncompete agreement entered into after employment will be enforced if it is supported

6  by independent consideration.  Independent, additional, consideration is required for the

7  valid formation of a modification or subsequent agreement." (internal citation omitted)).

8  "Independent consideration may include increased wages, a promotion, a bonus, a fixed

9  term of employment, or perhaps access to protected information."  *Labriola*, 100 P.3d at

10  794.  In other words, "[i]ndependent consideration involves new promises or obligations

11  previously not required of the parties."  *Id.*

12       In this case, Mr. Stuit and Ms. Burr began working at IP in 2005 and 2004,

13  respectively, and they signed the Confidentiality Agreements in 2008.  (Compl. ¶¶ 8, 9;

14  Smith Decl. Exs. 1 (Stuit Agreement), 2 (Burr Agreement).)  Therefore, the

15  Confidentiality Agreements must be supported by independent consideration to be valid.[4]

16  *See Labriola*, 100 P.3d at 794.  IP's complaint alleges that Mr. Stuit and Ms. Burr signed

17  the Confidentiality Agreements "[i]n consideration and as a condition of their respective

18  employment with xpedx, and access to xpedx's and IP's confidential and trade secret

19  resources."  (Compl. ¶ 25.)  The Confidentiality Agreements state in relevant part:  "In

20  ────────────────

21       [4] *Knight v. McDaniel*, 680 P.2d 448 (Wash. Ct. App. 1983), on which IP relies, is not
   applicable here because the employees in that case signed the covenant not to compete on their
   first day of work, *see id.* at 451, whereas here Mr. Stuit and Ms. Burr signed the Confidentiality
22  Agreements after being employed for several years.

1    consideration and as a condition of my employment (or continued employment) with

2    International Paper Company or one of its subsidiaries ('IP') and the salary paid to me, I

3    agree as follows . . . ."  (Smith Decl. Ex. 1 (Stuit Agreement) at 2, Ex. 2 (Burr

4    Agreement) at 1.)

5           To determine whether an agreement is supported by independent consideration,

6    the court compares the nature of the employer-employee relationship before and after

7    contracting.  *See Labriola*, 100 P.3d at 794.  Here, IP's complaint does not include facts

8    alleging that the relationship between IP, on the one hand, and Mr. Stuit and Ms. Burr, on

9    the other, changed as a result of the Confidentiality Agreements.  Neither continued at-

10   will employment nor promising to pay an employee his or her current salary constitute

11   independent consideration.  *Labriola*, 100 P.3d at 794; *see also Fry's Elecs.*, 2011 WL

12   666328 at *1.[5]  Furthermore, even though access to protected information may qualify as

13   independent consideration if the employee did not already have access to the information

14   prior to executing the contract modification, *see Labriola*, 100 P.3d at 794, there is no

15   allegation in IP's complaint that Mr. Stuit and Ms. Burr gained access to any new

16   protected information as a result of signing the Confidentiality Agreements.

17

18   _____

19        [5] IP relies on *Machen, Inc. v. Aircraft Design*, 828 P.2d 73 (Wash. Ct. App. 1992),
     *overruled on other grounds by Waterjet Tech., Inc. v. Flow Int'l Corp.*, 996 P.2d 598, 601

20   (Wash. 2000), which held that continued training and experience, coupled with a promise of
     continued employment, is sufficient to support a confidentiality agreement as a matter of law.

21   *Id.* at 80.  *Machen* does not control here because there is no allegation that Mr. Stuit and Ms.
     Burr received any promise of continued employment.  In fact, the Confidentiality Agreements
     stated that they did "not create an implied or express contract of employment."  (Smith Decl. Ex.

22   1 ¶ 7, Ex. 2 ¶ 7.)

1    Accordingly, for the above-stated reasons, the court grants Defendants' motion to dismiss

2    IP's breach of contract claim but also grants IP leave to amend.

3    **C.  Misappropriation of Trade Secrets against Mr. Stuit and Ms. Burr**

4         IP's complaint alleges that Mr. Stuit and Ms. Burr misappropriated IP's trade

5    secrets in violation of Washington's Uniform Trade Secrets Act ("the UTSA"), RCW

6    19.108.010 *et seq.*  (Compl. ¶¶ 62-72.)  The UTSA provides a statutory cause of action

7    for misappropriation of trade secrets.  RCW chapter 19.108.  First, a plaintiff asserting a

8    trade secret claim bears the burden of "proving that legally protectable secrets exist."

9    *Boeing Co. v. Sierracin Corp.*, 738 P.2d 665, 674 (Wash. 1987).  The definition of a trade

10   secret is a matter of law under the UTSA and the determination of whether specific

11   information is a trade secret is a factual question.  *West v. Port of Olympia*, 192 P.3d 926,

12   932 (Wash. Ct. App. 2008) (citing *Ed Nowogroski Ins., Inc. v. Rucker* ("*Rucker II*"), 971

13   P.2d 936, 941 (Wash. 1999)).  The UTSA defines a trade secret as:

14        [I]nformation, including a formula, pattern, compilation, program, device,
          method, technique, or process that:
15

16        (a) Derives independent economic value, actual or potential, from not being
          generally known to, and not being readily ascertainable by proper means
17        by, other persons who can obtain economic value from its disclosure or use;
          and

18        (b) Is the subject of efforts that are reasonable under the circumstances to
          maintain its secrecy.
19

20   RCW 19.108.010(4).  A trade secret requires effort and expense in compilation.  *Rucker*

21   *II*, 971 P.2d at 942.  Generally, a confidential customer list is a trade secret.  *Thola v.*

     *Henschell*, 164 P.3d 524, 528 (Wash. Ct. App. 2007).  But a customer list is not a trade
22

secret if it is readily ascertainable from a public source. *See, e.g.*, *Rucker II*, 971 P.2d at 944 (collecting cases).

A plaintiff asserting a UTSA claim must also establish that its trade secrets were misappropriated. The UTSA defines misappropriation as follows:

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> (i) Used improper means to acquire knowledge of the trade secret; or
>
> (ii) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was (A) derived from or through a person who had utilized improper means to acquire it, (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

RCW 19.108.010(2). Improper means include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. RCW 19.108.010(1).

The Washington Supreme Court has explained that, "[a]s a general rule, an employee who has not signed an agreement not to compete is free, upon leaving employment, to engage in competitive employment. In so doing, the former employee may freely use general knowledge, skills, and experience acquired under his or her former employer." *Rucker II*, 971 P.2d at 941. Nevertheless, "the former employee,

1   even in the absence of an enforceable covenant not to compete, remains under a duty not

2   to use or disclose, to the detriment of the former employer, trade secrets acquired in the

3   course of previous employment." *Id.*  The UTSA, therefore, prohibits former employees

4   from using "trade secrets of the former employer in order to obtain a competitive

5   advantage." *Rucker II*, 971 P.2d at 941.

6        Defendants argue that the court should dismiss IP's UTSA claim because Mr.

7   Stuit and Ms. Burr were not under a duty to maintain the secrecy of IP's trade secrets

8   given that the Confidentiality Agreements are invalid.  (Mot. at 8-9.)  Washington law,

9   however, does not support Defendants' position that a valid confidentiality agreement is

10  necessary to establish a duty.  Rather, as the Washington Supreme Court stated in *Rucker*

11  *II*, "[t]he nature of the employment relationship imposes a duty on employees and former

12  employees not to use or disclose the employer's trade secrets." *Id.* at 943; *see also Pac.*

13  *Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1202 (E.D. Wash. 2003)

14  ("Washington law imposes a duty not to use trade secrets in competition with a former

15  employer.").  Accordingly, the court denies Defendants' motion to dismiss IP's UTSA

16  claim.

17  **D.  Interference with Actual and Prospective Business Relations**

18        IP also alleges in its complaint that Defendants used xpedx's confidential

19  information, as defined in the Confidentiality Agreement, to interfere with IP's valid

20  contractual relationships with its customers and prospective customers, thereby damaging

21

22

1   IP.[6]  (Compl. ¶¶ 73-79 (Count III against Mr. Stuit and Ms. Burr), ¶¶ 80-86 (Count IV

2   against Midland).)  Defendants argue that these claims must be dismissed because they

3   are preempted by the UTSA.  (Mot. at 9.)

4          The UTSA "displaces conflicting tort, restitutionary, and other law of

5   [Washington] state pertaining to civil liability for misappropriation of a trade secret."

6   RCW 19.108.900(1).  The UTSA does not, however, affect contractual or other civil

7   liability or relief that is not based upon misappropriation of a trade secret.  RCW

8   19.108.900(2)(a).  Washington courts have interpreted these provisions of the UTSA to

9   mean that a plaintiff "may not rely on acts that constitute trade secret misappropriation to

10  support other causes of action."  *Thola*, 164 P.3d at 530 (quoting *Ed Nowogroski Ins.,*

11  *Inc. v. Rucker* ("*Rucker I*"), 44 P.2d 1093, 1097 (Wash. Ct. App. 1997), *aff'd*, 971 P.2d

12  936 (1999)).  A majority of UTSA jurisdictions, including Washington:  (1) assess the

13  facts that support the plaintiff's civil claim; (2) ask whether those facts are the same as

14  those that support the plaintiff's UTSA claim; and (3) hold that the UTSA preempts

15  liability on the civil claim unless the common law claim is factually independent from the

16  UTSA claim.  *Id.*; *Ultimate Timing, LLC v. Simms*, 715 F. Supp. 2d 1195, 1208 (W.D.

17  Wash. 2008).  "[P]roper application of this three-step analysis precludes duplicate

18  recovery for a single wrong."  *Thola*, 164 P.3d at 530.

19  _____

20       [6] The elements of tortious interference with contractual relations or business expectancy
    are:  (1) the existence of a valid contractual relationship or business expectancy; (2) that
21  defendants had knowledge of that relationship; (3) an intentional interference inducing or
    causing a breach or termination of the relationship or expectancy; (4) that defendants interfered
22  for an improper purpose or used improper means; and (5) resultant damages.  *Commodore v.*
    *Univ. Mech. Contractors, Inc.*, 839 P.2d 314, 322 (Wash. 1992).

1    Here, IP bases its claims for interference with business relations on Defendants'

2  alleged wrongful and improper use of "xpedx Confidential Information, including

3  information from the Paper Purchase Agreements to aid, assist and encourage clients and

4  prospects of xpedx to refrain from doing business with the company in favor of doing

5  business with" Midland.  (Compl. ¶¶ 76, 83.)  The complaint further explains that "Paper

6  Purchase Agreements between xpedx and the purchaser detailed, among other things,

7  confidential, trade secret and proprietary information pertaining to volume commitments,

8  forecasts, indexed-prices adjustments and limits, logistics, trim loss and incentives."  (*Id.*

9  ¶ 31.)  IP's UTSA claim similarly alleges that Mr. Stuit and Ms. Burr's "employment

10  with Midland has caused, or inevitably will cause, them to disclose or improperly use

11  IP's trade secrets, including, but not limited to, xpedx's sales and marketing information,

12  customer information, supplier, vendor and sourcing information, pricing data, and

13  details regarding a company's relationships with its customers."  (*Id.* ¶ 69.)

14    Based on a comparison of the allegations in the complaint supporting IP's UTSA

15  claim and interference with business relations claims, the court concludes that the

16  common law claims are not factually independent from IP's UTSA claim and are

17  therefore preempted as currently plead.  As the court in *Thola* explained, the trier of fact

18  cannot "consider evidence of [the defendant's] acts of trade secret misappropriation when

19  it deliberate[s] on [the plaintiff's] common law actions."  *Thola*, 164 P.3d at 531.  Absent

20  the allegation that Defendants wrongfully used IP's confidential information (alleged to

21  be a trade secret), IP's complaint fails to allege that Defendants "interfered for an

22  improper purpose or used improper means."  *Commodore v. Univ. Mech. Contractors,*

1  *Inc.*, 839 P.2d 314, 322 (Wash. 1992).  Without this necessary element, IP fails to state a

2  claim for interference with business relations.  *See id.* (setting forth the five elements of a

3  tortious interference with contractual relations or business expectancy claim, one of

4  which is "that defendants interfered for an improper purpose or used improper means").

5       IP advances two primary arguments in an effort to avoid this conclusion.  First, IP

6  argues that some courts have recognized that tort claims are not preempted unless and

7  until the appropriate decisionmaker (either the court or the jury) finds that the

8  information at issue qualifies as a trade secret under the statutory definition.  (Resp. at 6-

9  7 (citing *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 793 (Wis. 2006), and

10  *Callaway Golf v. Dunlop Slazenger Group Ams.*, 295 F. Supp. 2d 430, 437 (D. Del.

11  2003)).)  The Washington Supreme Court has not yet addressed this issue, so the court

12  "must predict how the highest state court would decide the issue[s] using intermediate

13  appellate court decisions, decisions from other jurisdictions, statutes, treatises, and

14  restatements as guidance."  *Ariz. Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 991

15  (9th Cir. 1995) (quoting *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990)).

16       Nearly all states in the country have enacted the Uniform Trade Secrets Act (or

17  some version thereof) "to make uniform traditional common law trade secret

18  protections."  *Thola*, 164 P.3d at 528 (citing RCW 19.108.910).  Accordingly, the

19  Washington Court of Appeals has instructed that, when possible, it construes the UTSA

20  to achieve uniformity among jurisdictions that have enacted it.  *Id.* (citing RCW

21  19.108.910 ("This chapter shall be applied and construed to effectuate its general purpose

22  to make uniform the law with respect to the subject of this chapter among states enacting

1   it.")).

2   "[A] majority of jurisdictions considering the question have held that a court 'need

3   not first determine whether the information that [the plaintiff] alleges was

4   misappropriated constitutes a trade secret before determining whether [the UTSA]

5   displaces [the plaintiff's] common-law claims.'" *CDC Restoration & Constr., LC v.*

6   *Tradesmen Contractors, LLC*, 274 P.3d 317, 330 n.6 (Utah Ct. App. 2012) (quoting

7   *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702,

8   721-22 (N.D. Ohio 2009) (collecting cases)); *see also BlueEarth Biofuels, LLC v.*

9   *Hawaiian Elec. Co.*, 235 P.3d 310, 324 (Haw. 2010) (holding "that a court need not wait

10  to determine if the allegedly misappropriated confidential information and/or

11  commercially valuable information constitutes a 'trade secret,' as that term is defined in

12  the HUTSA, before considering preemption").

13         This conclusion stems from the fact that "the UTSA's preemption provision has

14  generally been interpreted to abolish all free-standing alternative causes of action for theft

15  or misuse of confidential, proprietary, or otherwise secret information falling short of

16  trade-secret status . . . ." *CDC Restoration*, 274 P.3d at 329 (quoting *Hauck Mfg. Co. v.*

17  *Astec Indus., Inc.*, 375 F. Supp. 2d 649, 655 (E.D. Tenn. 2004) (collecting cases)); *see*

18  *also BlueEarth Biofuels*, 235 P.3d at 323 (Haw. 2010) (holding "that the HUTSA

19  preempts non-contract, civil claims based on the improper acquisition, disclosure or use

20  of confidential and/or commercially valuable information that does not rise to the level of

21  a statutorily defined trade secret"); *Mortg. Specialists, Inc. v. Davey*, 904 A.2d 652, 663-

22

1   664 (N.H. 2006) (collecting cases); *Robbins v. Supermarket Equip. Sales, LLC*, 722

2   S.E.2d 55, 58 (Ga. 2012).

3        Because the UTSA instructs that it should be applied to effectuate the general

4   purpose of making the law uniform among the states that have enacted the Uniform Trade

5   Secrets Act, RCW 19.108.910, the court concludes that the Washington Supreme Court

6   would follow the majority of courts that have addressed the issue and hold that that courts

7   may consider UTSA preemption at the motion to dismiss stage before it has been decided

8   whether the allegedly confidential information qualifies as a trade secret under the

9   UTSA.  Accordingly, this court is not persuaded by IP's argument it cannot decide the

10   preemption issue now.

11        IP's second argument to avoid dismissal of its interference with business relations

12   claims is that "common law claims are not preempted by the UTSA if the claims require

13   additional elements."  (Resp. at 7 (quoting *LaFrance Corp. v. Werttemberger*, No. C07-

14   1932Z, 2008 WL 5068653, at *7-*8 (W.D. Wash. Nov. 24, 2008)).)  As was the case

15   with IP's first argument, the Washington Supreme Court has not spoken on the scope of

16   preemption under the UTSA.  Nevertheless, the Washington Court of Appeals in *Thola*

17   touched on this issue.  It noted that "[i]n some jurisdictions, a common law claim is not

18   preempted if the elements require some allegation or factual showing beyond those

19   required under the UTSA."  *Thola*, 164 P.3d at 530 n.5.  The *Thola* court, however,

20   declined to adopt this view of the UTSA, *id.*, and instead set forth the three-part test

21   articulated above, which focuses on the underlying facts supporting each claim, rather

22   than the elements of each claim, *id.* at 530.

ORDER- 16

1     In *LaFrance*, the case relied upon by IP, the Western District of Washington

2  followed the weight of authority at that time to hold that the plaintiff's common law

3  claims were not preempted by the UTSA if the claims required additional elements.

4  *LaFrance*, 2008 WL 5068653, at *3.  Yet the weight of authority has tipped away from

5  the so-called "elements" test adopted by the court in *LaFrance*.  *See BlueEarth Biofuels*,

6  235 P.3d at 316 (noting that the "elements" test is the minority view and collecting

7  cases); *see also CDC Restoration*, 274 P.3d at 330-31 (declining to adopt the "elements"

8  test).  The majority of courts now employ a test similar to the one adopted by the court in

9  *Thola*.  *See, e.g.*, *BlueEarth Biofuels*, 235 P.3d at 316-17 (noting that the majority of

10 courts examine the factual allegations underlying each claim); *CDC Restoration*, 274

11 P.3d at 330-31 (same).  Because the "elements" test was not adopted by the court in

12 *Thola* and currently represents the minority view, this court declines to employ it here.

13     In sum, the court concludes that IP's claims for interference with business

14 relations are preempted by the UTSA as they are currently plead.  The court therefore

15 dismisses these claims (Counts III and IV) with leave to amend.

16 **E.  Interference with Employee Confidentiality Agreements against Midland**

17     IP's complaint alleges that Midland tortuously interfered with the Confidentiality

18 Agreements.  (Compl. ¶¶ 87-93.)  The elements of tortious interference are:  (1) a valid

19 contractual relationship; (2) defendants' knowledge about the relationship; (3)

20 defendants' intentional interference, causing a breach of the relationship; (4) that

21 defendants' interference was for an improper purpose or used improper means; and (5)

22 damages.  *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997).

1   Defendants move to dismiss IP's tortious interference claim against Midland, arguing that

2   IP has not properly alleged the first and fourth elements.  (Mot. at 11-13.)

3         The court agrees with Defendants that IP has not sufficiently alleged the existence

4   of a valid contractual relationship.  As discussed above, IP has not alleged that the

5   Confidentiality Agreements were supported by new consideration.  Without allegations

6   of a valid contractual relationship, IP cannot state a claim for tortious interference.  *See*

7   *Leingang*, 930 P.2d at 300.  Nevertheless, IP sufficiently alleges that Midland's

8   interference was for an improper purpose by alleging:  "Midland has intentionally,

9   wrongfully and improperly interfered with the Confidentiality Agreements between IP,

10  Stuit, and Burr by using and/or inducing Stuit and Burr to use IP Confidential

11  Information to aid, assist and encourage clients and prospects of xpedx to refrain from

12  doing business with xpedx in favor of doing business with Midland."  (Compl. ¶ 91.)

13  The alleged improper purpose was the use of confidential information, not the seeking of

14  a competitor's business, as Defendants claim in their brief.  (*See* Mot. at 12-13.)

15        In sum, because IP has not alleged a valid contractual relationship between itself

16  and Mr. Stuit and Ms. Burr, the court dismisses IP's tortious interference claim against

17  Midland with leave to amend.

18  **F.  Violation of the Washington Consumer Protection Act against Mr. Stuit and Ms.**
       **Burr**

19

20        IP's complaint alleges that Mr. Stuit's and Ms. Burr's actions, as described in the

    complaint, constitute unfair or deceptive acts or practices, or unfair methods of

21  competition, in the conduct of trade or commerce within the meaning of the CPA, RCW

22

19.86.020.  (Compl. ¶ 95.)  IP further alleges that Mr. Stuit's and Ms. Burr's unfair acts

or practices "adversely impact the public interest" and have harmed IP.  (*Id.* ¶¶ 96-97.)

In order to prevail on a private CPA claim, "a plaintiff must establish five distinct

elements:  (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce;

(3) public interest impact; (4) injury to plaintiff in his or her business or property; and (5)

causation.  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531,

533 (Wash. 1986).  Defendants argue that IP's CPA claim must be dismissed for three

reasons (Mot. at 14-17), each of which the court discusses below.

First, Defendants argue that IP's CPA claim is foreclosed by the UTSA because it

is based exclusively on Mr. Stuit's and Ms. Burr's alleged misuse of IP's confidential

information and trade secrets.  (*Id.* at 14-15.)  Under the preemption test articulated in

*Thola* and described above, the court concludes that IP's complaint, as currently plead,

does not establish that its CPA claim is factually independent from its UTSA claim.

Rather, IP uses the same facts to support both claims.  (*See* Compl. ¶ 95 ("The actions of

Stuit and Burr, as described herein, constitute unfair or deceptive acts or practices.").)

Second, Defendants contend that IP has not plead its CPA claim with particularity

as required by Federal Rule of Civil Procedure 9(b).  (Mot. at 15-16.)  Rule 9(b) states in

pertinent part:  "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "Notwithstanding the

fact that Plaintiffs have not plead a common law fraud claim, Rule 9(b) applies where a

claim is based on 'a unified course of fraudulent conduct,' even if the word 'fraud' is not

1  used."[7]  *Vernon v. Qwest Comm'ns Int'l, Inc.*, 643 F. Supp. 2d 1256, 1264 (W.D. Wash.

2  2009) (quoting *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1107 (9th Cir. 2003)).

3  Similarly, "Rule 9(b) can also apply where fraud is an essential element of a claim or

4  where Plaintiffs allege some fraudulent and some non-fraudulent conduct." *Id.* at 1265

5  (citing *Vess*, 317 F.3d at 1103-05). In this case, IP's allegations do not sound in fraud,

6  therefore IP is not required to comply with Rule 9(b)'s heightened pleading standards.

7  The court thus declines to dismiss IP's CPA claim on this ground.

8        Finally, Defendants argue that IP has not properly alleged the third element of a

9  CPA claim—harm to the public interest. (Mot. at 16-17.) The CPA is meant to protect

10  the public, not to provide an additional remedy for private wrongs. *Lightfoot v.*

11  *MacDonald*, 544 P.2d 88, 89 (Wash. 1976); *Zalia Digo, Inc. v. Smark Circle Int'l, LLC*,

12  No. C11-544RSL, 2012 WL 836233, at *3 (W.D. Wash. Mar. 12, 2012). A private

13  dispute affects the public interest when there is a "likelihood that additional plaintiffs

14  have been or will be injured in exactly the same fashion." *Hangman Ridge*, 719 P.2d at

15  538. Here, IP's conclusory allegation that Mr. Stuit's and Ms. Burr's unfair acts or

16  practices "adversely impact the public interest" (Compl. ¶ 96) is insufficient to support a

17  CPA violation. Further, the facts alleged in the complaint do not support an inference

18

19

20        [7] Under Washington law, the nine elements of fraud are: (1) representation of an existing
21  fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the
   speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7)
   plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9)
22  damages suffered by the plaintiff. *Stiley v. Block*, 925 P.2d 194, 204 (Wash. 1996).

1   that additional plaintiffs have been or will be injured in exactly the same way IP was

2   injured, that is, by the alleged misuse of its confidential information.

3       Accordingly, the court dismisses IP's CPA because it is preempted by the UTSA

4   as currently plead and because IP fails to sufficiently allege harm to the public interest.

5   Nevertheless, the court's dismissal is with leave to amend.

6                      **IV.   CONCLUSION**

7       For the foregoing reasons, the court GRANTS in part and DENIES in part

8   Defendants' motion (Dkt. # 21).  The court GRANTS IP 15 days from the date of this

9   order to file an amended complaint that cures the deficiencies identified in this order.

10      Dated this 21st day of May, 2012.

11

12

13   _____

14   JAMES L. ROBART
    United States District Judge

15

16

17

18

19

20

21

22

ORDER- 21